UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| TERRY M. BABB and FEDERAL AIR ) | |
| MARSHAL ASSOCIATION, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 05-cv-1088 (RCL) |
| ) | |
| MICHAEL CHERTOFF, Secretary, ) | |
| Department of Homeland Security, ) | |
| THOMAS D. QUINN, Director, ) | |
| Federal Air Marshal Service ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**

Defendants move to dismiss this action pursuant to Rule 12(b)(1) or, in the alternative,

pursuant to Rule 12(b)(6).  In support of this motion, defendants refer to the attached

memorandum of points and authorities and exhibits attached therein.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

SUSAN K. RUDY
Assistant Branch Director


/s/
SAMUEL C. KAPLAN (D.C. Bar No. 463350)
GILLIAN FLORY (Maryland Bar)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, Rm. 7302
Washington, D.C.  20044
(202) 514-4686 phone
(202) 616-8202 fax
Dated:    October 6, 2005          samuel.kaplan@usdoj.gov
Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————
                                                        )
TERRY M. BABB and FEDERAL AIR          )
MARSHAL ASSOCIATION, INC.,                 )
                                                        )
          Plaintiffs,                                 )
                                                        )
          v.                                            )          05-cv-1088 (RCL)
                                                        )
MICHAEL CHERTOFF, Secretary,            )
Department of Homeland                         )
Security, and THOMAS D. QUINN,           )
Director, Federal Air Marshal                   )
Service,                                               )
                                                        )
          Defendants.                              )
—————————————————————  )


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**

**INTRODUCTION**

In this case, an organization of federal air marshals ("FAMA") and its president Terry

Babb raise several First Amendment claims against the Federal Air Marshal Service ("FAMS")

and the Department of Homeland Security ("DHS"). The Court lacks jurisdiction over these

claims. Plaintiffs' primary claim seeks to enjoin a FAMS policy that has been repealed and is no

longer in effect. Plaintiffs also seek to enjoin the defendants from requiring FAMA's members

to provide any information about the organization in the future, even though there is no pending

or imminent request for such information, and thus no concrete factual scenario within which to

evaluate the legitimacy of such a request. Exercising jurisdiction over and upholding this unripe

claim would, in addition to violating Article III, unduly interfere with the agency's future ability

to investigate wrongdoing. There is also no threat of imminent injury supporting plaintiffs'
attempt to enjoin internal procedures governing the disclosure of investigative information. To
the contrary, the office with the challenged procedures no longer even has investigative
jurisdiction over FAMS employees.

Two of plaintiffs' three claims are also subject to dismissal pursuant to Rule 12(b)(6).
There is no basis in law for plaintiffs' attempt to immunize FAMA from all future investigative
scrutiny by preventing any future inquiries about the organization and its officers. Nor is there
any basis for plaintiffs' challenge to a straightforward policy that simultaneously protects the
integrity of government investigations and the ability of those involved in such investigations to
protect their legal rights and privacy.

## FACTUAL BACKGROUND

Plaintiffs in this action are Terry Babb, a Federal Air Marshal and President of the
Federal Air Marshal Association, Inc. ("FAMA"), and FAMA. Complaint ("Compl.") ¶¶ 5-6.
FAMA is an organization of active-duty Federal Air Marshals and Federal Flight Deck Officers.
*Id*. at ¶ 6. Defendants are Michael Chertoff in his official capacity as the Secretary of the
Department of Homeland Security ("DHS") and Thomas D. Quinn in his official capacity as the
Director of the Federal Air Marshal Service ("FAMS"). *Id*. at ¶¶ 8-9.

The primary subject of this litigation is a repealed FAMS Policy Directive ("ADM 3700")
that, according to plaintiffs, (1) "portends a Federal Air Marshal against criticizing or ridiculing
the Federal Air Marshal Service policy (sic) or other employee by speech, writing or expression
which 'impairs the operation or efficiency of the Federal Air Marshal service,'" (2) "prohibits a
Federal Air Marshal from creating or participating in unofficial Internet websites concerning the

Federal Air Marshal Service, the Transportation Security Administration, or the U.S. Department of Transportation," and (3) "proscribes the release or divulgence of *any* information related to the Federal Air Marshal Service, the Transportation Security Administration or the U.S. Department of Transportation," including speech at public gatherings. *Id*. at ¶¶ 16-19 (emphasis in original).

This policy directive, whatever its intended scope, is no longer in effect. On April 18, 2005, more than one month prior to the filing of the instant lawsuit, the Bureau of Immigration and Customs Enforcement ("ICE"), which, until less than one week ago, was the supervising agency for FAMS, distributed to all ICE employees an Interim Table of Offenses and Penalties for Non-Bargaining Unit Employees – a group that includes FAMS employees. *See* Exhibit ("Ex.") 1, Declaration of Ilir M. Tsungu ("Tsungu Dec."), October 5, 2005, Attachment ("Att.") 1, Memorandum from Michael Garcia to All ICE Employees re: Interim Table of Offenses and Penalties for Non-Bargaining Unit Employees ("Table of Penalties"). The stated intent of the table was to "provide guidance to employees regarding unacceptable behavior, and the consequences for that behavior" and "to bring fairness and consistency of application of those standards to non-bargaining unit employees in all programs." *Id*. The Table provides in pertinent part that:

> Nothing in this table should be interpreted as prohibiting: (1) the reporting of suspected fraud, waste, abuse, corruption, misconduct, or a substantial and specific danger to public health or safety to appropriate agency officials (see 5 U.S.C. sec. 2302); or (2) the free expression of an employee's opinions on matters of public concern in his or her private capacity, consistent with reasonable and necessary limitations on disclosures (see Part M [which addresses disclosure of classified or otherwise sensitive information]).

3

*See id*. at 25 n.2.  The issuance of the Table of Penalties also preceded the filing of a similar lawsuit in the Central District of California, challenging the old FAMS policy.

Approximately three months later, the Director of FAMS sent out a memorandum to FAMS employees that eliminated any potential doubt that employees could speak out on matters of public concern.  *See* Ex. 1, Att. 2, OMS 3700, Memorandum From Thomas D. Quinn Concerning Employee Responsibilities and Conduct ("OMS 3700" ), July 26, 2005.  The stated purpose of the memorandum was to "establish[] the standards of behavior required of all Federal Air Marshal Service (FAMS) employees."  *Id*. at 1.  The published amendments provided, *inter alia*, that nothing "shall be interpreted as prohibiting legally protected disclosures, including disclosures to Congress, under 5 U.S.C. § 2302 or other Whistleblower protection laws or regulations."  *Id*. at ¶ 7(i).  Further, the message provided that "an employee has the right to disclose any information that the employee reasonably believes evidences a violation of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, unless such disclosure is prohibited by law, valid federal regulation or executive order."  *Id*. at ¶ 12(f).

The amended section further provides that nothing in the new policy "is intended to limit the free public expression of an employee's personal opinions about matters of public concern relating to the FAMS – provided the individual complies with all laws and policies safeguarding the unauthorized disclosure of official information."  *Id*. at ¶ 18(c).  Employees are only required to notify the ICE Office of Public Affairs before making statements in their "official capacity" or where "the public is reasonably likely to perceive the statement as reflecting the views of FAMS or its management."  *Id*. at ¶ 18(b).

4

On October 1, 2005, authority over FAMS was transferred to the Transportation Security Administration. TSA's employee policies also permit employees to comment on matters of public concern. *See* Ex. 3, Declaration of Paul V. Ross, Attachment, Transportation Security Administration, Interim Policy on Employee Responsibilities and Conduct ("TSA Employee Policy"), January 9, 2003, ¶¶ 4, 10, 12.

<div align="center">

**STANDARD OF REVIEW**

</div>

"A Court must accept all of the non-movant's factual allegations as true when reviewing a motion to dismiss under Rule 12(b)(1), but such allegations will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a Rule 12(b)(6) motion for failure to state a claim." *Brady Campaign to Prevent Gun Violence United With the Million Mom March*, 339 F. Supp. 2d at 72-73 (internal citation, brackets, and quotation marks omitted). "A Court may also consider material beyond the allegations in the plaintiff's complaint when determining whether it has subject matter jurisdiction pursuant to Rule 12(b)(1)." *Id*. at 73.

A complaint should be dismissed pursuant to Rule 12(b)(6) "if it appears beyond doubt that no set of facts proffered in support of plaintiff's claim would entitle him to relief." *Meng v. Schwartz*, 116 F. Supp. 2d 92, 95 (D.D.C. 2000). In evaluating a Rule 12(b)(6) motion, a court "should presume the allegations to be true and liberally construe them in favor of the plaintiff." *Id*. At the same time, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness," *id*. (citations and internal quotation marks omitted), nor are unwarranted inferences drawn by the plaintiffs. *Logan*, 357 F. Supp. 2d at 153; *see also Trudeau v. Federal Trade Comm'n*, No. CIV.A. 05-0400, 2005 WL 2037360, *6 (D.D.C. Aug.

<div align="center">5</div>

25, 2005) ("Conclusory legal and factual allegations, however, need not be considered by the court" in deciding a Rule 12(b)(6) motion).

## ARGUMENT

## I.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CHALLENGE TO ADM 3700, WHICH IS NO LONGER IN EFFECT

Plaintiffs' principal claim in this lawsuit requests that this Court enjoin a directive that is no longer in effect.  Count I of plaintiffs' complaint "request[s] that this court enjoin the defendants from present and future enforcement of ADM 3700(17)."  However, both the April 18, 2005, Table of Offenses and Penalties and the implementation of OMS 3700 made clear that ADM 3700(17) has been repealed.  *See* Ex. 1, Att. 1, Table of Penalties at 25 n.2, Att. 2, OMS 3700 at ¶¶ 7(i), 12(f), and 18. The new policy also made clear that employees may speak out on matters of public concern in their personal capacity without violating any disciplinary rule.  *Id*. Accordingly, the Court lacks jurisdiction over plaintiffs' complaints concerning that policy.

Because the old policy (*i.e.*, ADM 3700) has been repealed, plaintiffs' claim is moot. More than one month prior to the filing of this lawsuit, the Bureau of Immigration and Customs Enforcement ("ICE"), in an official document listing prohibited conduct and penalties for non-bargaining unit ICE employees, stated that employees had the right to express their "opinions on matters of public concern in [their] private capacity."  *See* Ex. 1, Att. 1, Table of Penalties at 25 n.2.

Moreover, if there was any doubt that the policy had been repealed as of the date of the lawsuit, FAMS eliminated that doubt when it issued OMS 3700 on July 26, 2005.  As explained *supra*, the new policy provided that FAMS employees may speak "about matters of public

6

concern–including opinions about issues of public concern related to the FAMS," and also

protects the right of employees to disclose violations of law and instances of gross

mismanagement or danger to public safety unless prohibited by another valid law or regulation.

Ex. 1, Att. 2, OMS 3700 ¶¶ 7(i), 12(f), and 18.  The new policy also eliminated sections of the

old policy that are the subject of plaintiffs' complaint, including the prohibition related to

informal websites.  *Id*; *see also* Compl. ¶¶ 17-19.  Moreover, FAMS is now under the jurisdiction

of TSA, which, like OMS 3700, does not restrict the ability of its employees to speak out on

matters of public concern.  *See* Ex. 3, Declaration of Paul V. Ross, TSA Employee Policy,

January 9, 2003, at ¶¶ 4, 10, 12.  Because the provision that plaintiffs seek to enjoin is no longer

in effect, plaintiffs' claim is moot.

 Neither of the qualifications that apply to the doctrine of mootness is applicable in this

case.  The exception for cases that are "capable of repetition yet evading review" does not apply

because, even assuming the dispute is capable of repetition, it would not evade review because an

aggrieved party could bring a lawsuit to challenge a hypothetical recurrence of the policy.

 Further, the voluntary cessation doctrine – which provides that "generally voluntary

cessation of challenged activity does not moot a case," *Nat'l Black Police Assoc. v. District of*

*Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) – is inapplicable because the process of repealing

the policy had commenced prior to litigation.  In the standard voluntary cessation case, an agency

repeals a policy in response to litigation.

 Indeed, for similar reasons, plaintiffs lack standing because they have not satisfied their

burden of establishing that ADM 3700 confronted them with a "real and immediate" threat of

injury as of the date that they filed their lawsuit.[1]  The challenged policy had been in effect since

August 9, 2002, without legal challenge by the plaintiffs or any other party prior to April 21,

2005 (the date that a lawsuit challenging the policy was filed in California).  Further, as stated

*supra*, the process of repeal was underway as of the date of the lawsuit.  A three-year-old policy

that has never been challenged whose repeal was underway prior to legal challenge does not pose

the immediate threat of injury that is necessary to establish Article III standing.

Moreover, even if the plaintiffs had standing and the voluntary cessation exception to

mootness were applicable, "'there is no reasonable expectation that the alleged violation will

recur'" and intervening events have "'completely or irrevocably eradicated the effects of the

alleged violation.'"  *Nat'l Black Police Assoc. v. District of Columbia*, 108 F.3d at 349 (*quoting*

*County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)); *see, e.g.*, *Princeton Univ. v. Schmid*,

455 U.S. 100, 103 (1982) (substantial amendment of regulations while case was pending

rendered dispute moot); *Arizona Public Service Co. v. E.P.A.*, 211 F.3d 1280, 1296 (D.C. Cir.

2000) (dismissing challenge on mootness grounds after EPA clarification where there was "no

indication that EPA will revert to its past proposal" concerning public commentary on tribal

boundary disputes).  Plaintiffs point to no indication suggesting that FAMS intends to return to

the old policy, and FAMS is now under the jurisdiction of TSA, whose policy also does not

restrict the ability of employees to speak on matters of public concern.  Further, as stated *supra*,

---

[1]  "[I]n a lawsuit brought to force compliance, it is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the 'threatened injury [is] certainly impending.'"  *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190 (2000) (*quoting Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (second brackets in original).  The threat of injury must be "both real and immediate, not conjectural or hypothetical."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citation and internal quotation marks omitted).

efforts to ensure the ability of FAMS and other ICE employees to speak out on matters of public concern were underway prior to the filing of any litigation concerning the old policy.  *See* Ex. 1, Att. 1, Table of Penalties at 25 n.2.   Plaintiffs, moreover, waited more than two years to challenge the old policy.  There is simply no reason to believe that the repealed policy will be reinstituted if the Court dismisses this case and every reason to believe that it will not.

## II.    PLAINTIFFS' FREEDOM OF ASSOCIATION CLAIM SHOULD BE DISMISSED

### A.    The Court Lacks Jurisdiction Over Plaintiffs' Freedom of Association Claim

In Count II of their complaint, plaintiffs assert that "members of the defendants' Office of Professional Reponsibility compelled a statement from plaintiff Babb," that included answers to various questions about FAMA.  Compl. ¶¶ 41-43.  Plaintiffs assert that requiring answers to these questions "has seriously infringed on the privacy of FAMA and beliefs guaranteed by the First Amendment" and chilled the organization's ability to do business.  *Id*. at ¶¶ 46-47.  Plaintiffs request that "this court enjoin the defendants from (sic) present and future practice of compelling disclosure of FAMA information."  Compl. Count II, Prayer for Relief.

The Court lacks jurisdiction over this claim.  *First*, there is no present controversy because (1) plaintiff Babb has already divulged the information requested by OPR investigators, Compl. ¶¶ 41, 43, and (2) plaintiffs do not allege that there is a pending request for information about FAMA.  In this respect, this case strongly resembles the decision of the Eighth Circuit Court of Appeals in *Gilbert v. Nix*, 990 F.2d 1044 (8th Cir. 1993), which addressed the plaintiffs' motion to enjoin the defendant warden and other prison officials from compelling officers to answer questions in administrative investigations.  The Court held that the lawsuit was moot

9

because "the complaint was filed after Gilbert and the other correctional officers had already

answered the investigatory questions . . . ." *Id*. at 1046.   Likewise in this case, the complaint

was filed after plaintiff Babb had already answered the questions about FAMA, and the claim is

therefore not justiciable.[2]

   *Second*, plaintiffs have also failed to establish a threat of imminent future harm sufficient

to establish standing.  "Allegations of a subjective 'chill'" such as those in paragraphs 47 and 50

of plaintiffs' complaint are "not an adequate substitute" for "a threat of specific future harm."

*Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).  In order for the alleged injury to recur, defendants

would have to institute another investigation of plaintiff Babb or one of FAMA's members, and

in the course of that investigation, would have to request further information about FAMA from

the subject of the investigation.  That request would, at a minimum, have to implicate plaintiffs'

asserted rights – *i.e.*, it would have to be unrelated to any legitimate investigation and would have

to be sufficiently sensitive that it could be reasonably said that it threatens the right of

association.    Plaintiffs fail to establish that any, let alone all, of these events are imminent.  To

the contrary, plaintiffs allege only that the "practice of the defendants in compelling disclosure of

information about FAMA under threat of administrative or criminal action will continue,"

---

   [2]  The *Gilbert* Court further explained that "[a]lthough in theory the issues involved" in the case
were "capable of repetition, they will not always escape review" because, as in this case, the plaintiff
could seek review of any disciplinary action.  The same is true here, but the exception is inapplicable for
an even more basic reason.  Plaintiff Babb's response to the questions prior to the filing of the complaint
deprived him of standing, and the "capable of repetition" doctrine does not provide an exception to the
law of standing.  *Friends of the Earth, Inc.*, 528 U.S. at 191 (If "a plaintiff lacks standing at the time the
action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the
complainant to a federal judicial forum.")*; see also Worldcom, Inc. v. F.C.C.*, 308 F.3d 1, 10-11 (D.C.
Cir. 2002) ("that familiar exception to mootness cannot confer standing on a claim when injury in fact
was missing at the outset") (*citing Friends of the Earth, Inc.*, 528 U.S. at 191).

10

Compl. ¶ 48, and that "[p]laintiff Babb as well as all other members of the Federal Air Marshal Association will now or in the foreseeable future be prosecuted for alleged violation" of ADM 3700.  Compl. ¶ 49.  Both statements are entirely conclusory.  Moreover, plaintiffs' reliance on ADM 3700 to establish their standing to advance their freedom of association claim only further establishes that the threat of future injury is exceedingly unlikely given that ADM 3700 has been repealed.  *See supra* at 2-4, 7.  Far from satisfying their burden of demonstrating an imminent threat to their right of association, plaintiffs' allegations prove the opposite.

*Third,* for similar reasons, plaintiffs' claim is unripe.  "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Texas v. United States*, 523 U.S. 296, 300 (1998) (*quoting Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (additional citation and internal quotation marks omitted))*.*  The ripeness of a particular claim depends upon "(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration."  *Nat'l Park Hospitality Assoc. v. Dept. of the Interior*, 538 U.S. 803, 808 (2003) (*citing Abbott Laboratories v. Gardner*, 387 U.S. at 149).

The issues presented by plaintiffs' right of association claim are unfit for judicial decision.  In the event that there is an investigation of plaintiff Babb or FAMA's members, and in the event that the questions meet the criteria described *supra*, it would undeniably be helpful to the Court to evaluate plaintiffs' right of association claim in the context of a concrete factual situation where the Court could, *inter alia*, examine the information sought and the relevance of the information to the investigation at issue.  Indeed, even in "situations where," unlike here, "an allegedly injurious event is certain to occur, the Court may delay resolution of constitutional

11

questions until a time closer to the actual occurrence of the disputed event when a better factual

record might be available." *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143 (1974).

Moreover, as explained *supra* at 10-11, the hardship to the parties from withholding

consideration is, at best, minimal.

*Fourth*, plaintiffs' alleged injury is not redressable at this time because, regardless of the

truth and sufficiency of their allegations, plaintiffs are plainly not entitled to the relief that they

seek – *i.e.*, an injunction that prevents investigators in the future from asking *any* questions about

FAMA.  Courts have noted in a variety of contexts the importance of deferring to agencies in

setting internal procedures, *see Vermont Yankee Nuclear Power Corp. v. Natural Resources

Defense Council*, 435 U.S. 519 (1978), disciplining employees,[3] and, perhaps most importantly,

in managing their own investigations.[4]  Moreover, given that courts have repeatedly counseled

against premature interference in specific, ongoing investigations, the standard for obtaining an

---

[3] *See Hargett v. Summerfield*, 243 F.2d 29, 32 (D.C. Cir. 1957) ("employee removal and discipline are almost entirely matters of executive agency discretion . . . ."); *Pararas-Carayannis v. Dep't of Commerce*, 9 F.3d 955, 958 (Fed. Cir. 1993) ("The reasonableness of a disciplinary action is a matter usually within the discretion of the agency . . . ."); *Weston v. HUD*, 724 F.2d 943, 949 (Fed. Cir. 1983) ("There exists a great reluctance on the part of the courts to become enmeshed in the disciplinary process and, accordingly, greater deference is accorded to the sound discretion of the agency in such matters.").

[4] *See FCC v. Schreiber*, 381 U.S. 279, 290-292 (1965) ("administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties'" and deferring to agency judgment concerning disclosure of investigatory information) (*quoting FCC v. Potsville Broadcasting Co.*, 309 U.S. 134, 138 (1940); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (Administrative agencies have "a power of inquisition, if one chooses to call it that, which is not derived from the judicial function.  It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not"); *FTC v. Invention Submission Corp.*, No. 89-272, 1991 WL 47104, *2 (D.D.C. Feb. 14, 1991) ("In evaluating relevance objections to agency investigations, a court must respect the agency's 'power of inquisition' and interpret relevance broadly").

injunction against a line of questioning for *all* hypothetical future internal investigations not yet commenced is unsustainable.[5]  Such an injunction would effectively immunize FAMA members from any misconduct relating to that organization and significantly interfere with the investigative prerogatives of the Office of Professional Responsibility.

At the same time, a more modest injunction of a type that plaintiffs do not request – *e.g.*, an injunction not to ask questions about FAMA that are designed to suppress First Amendment rights or an injunction against asking questions about FAMA that are not related to a legitimate investigatory purpose – would be nothing more than an "obey the law" injunction which courts have repeatedly held does not satisfy the specificity requirement of Fed. R. Civ. P. 65(d).[6]  The

---

[5]  *See Federal Trade Comm'n v. Standard Oil Co. Of California*, 449 U.S. 232, 243 (1980) (declining to enjoin enforcement proceeding and holding that "[j]udicial intervention into the agency process denies the agency an opportunity to correct its own mistakes and to apply its expertise"); *Bannum, Inc. v. Sawyer*, 251 F. Supp. 2d 7, 11 n.2 (D.D.C. 2003) (holding that exceptions to the prohibition on preenforcement review are not implicated where the agency "has simply begun an investigation and has not even made a decision whether to initiate a formal administrative enforcement proceeding"); *Hunter v. Securities and Exchange Comm'n*, 879 F. Supp. 494, 501 (E.D. Pa. 1995) (refusing to enjoin ongoing SEC investigation, notwithstanding prior violation of right to privacy and reasoning that there "is no constitutional right not to be investigated for suspected violations of federal law by an agency authorized by Congress to conduct such investigations in its discretion"); *cf. Boggs v. Bowron*, 842 F. Supp. 542, 548 (D.D.C. 1993) ("The standard of obtaining any form of injunctive relief is high, but a party who seeks to enjoin a criminal investigation has a particularly heavy burden. . . .  In addition, the Supreme Court has routinely rejected collateral challenges which impede ongoing criminal investigations").

[6]  *See, e.g., Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004) (injunctive relief against an employer accused of a variety of Title VII violations to comply with Title VII lacked sufficient specificity); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (injunction prohibiting City from "discriminating on the basis of race in its annexation decisions" did no more than instruct defendants to "obey the law" and thus did not satisfy the specificity requirement of Fed. R. Civ. P. 65(d)); *City of Mishawaka, Indiana v. Amer. Electric Power Co., Inc.*, 616 F.2d 976, 991 and n.18 (7th Cir. 1980) (injunction forbidding defendants from monopolizing or attempting to monopolize the distribution and sale of electric power at retail within the defendant's service area or any of the plaintiff municipalities in violation of the Sherman Antitrust Act lacked sufficient specificity); *Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897-98 (5th Cir. 1978) (injunction forbidding "discriminating" against the plaintiffs "on the basis of color, race, or sex in employment practices or conditions of employment in defendants' Cleveland, Mississippi facility" lacked sufficient specificity)*; Elend v. Sun Dome, Inc*., 370

lack of specificity would, if anything, be particularly problematic in the instant context because of the burdens that it would place on the agency's internal investigative authority. Respect for OPR's independent investigative authority, and the concomitant importance of not making any misconduct immune from legitimate investigation, are additional factors that establish the unripeness of plaintiffs' claims and the importance of, at a minimum, awaiting a concrete factual scenario.

*Fifth*, while the failure to establish a threat of imminent future harm is sufficient by itself to preclude standing, it is also worth noting the inadequacy of plaintiffs' conclusory allegations as to the information that has already been required and disclosed. *See, e.g.*, Compl. ¶ 25 ("Incensed by the negative media stories and perceived leaks of federal air marshal information to the press by employees, defendants undertook an internal investigation of various air marshals in an attempt to smother and prevent the disclosure by various federal air marshals of agency mismanagement, fraud, waste, and abuse.") Such conclusory pleading is insufficient even when evaluated under the more lenient standard of a Rule 12(b)(6) motion. *See Trudeau v. Federal Trade Comm'n*, No. 05-0400JDB, 2005 WL 2037360, *13 (D.D.C. August 25, 2005) (holding that the "allegation that the FTC acted with an intent to retaliate against Trudeau is conclusory and unsupported" and noting that the "bad faith of government actors is notoriously easy to allege and difficult to disprove"). Moreover, "perceived leaks of federal air marshal information," Compl. ¶ 25, could easily be a reasonable basis for initiating an investigation, depending upon the information at issue.

---

F. Supp. 2d 1206, 1211 (M.D. Fl. 2005) (injunction against violating First Amendment rights at future Secret Service protests would be an improper "obey the law" injunction).

14

Such allegations are particularly inadequate when one appreciates the indisputable fact that the investigators who conducted the investigation and asked the questions at issue work for the Office of Professional Responsibility of the Bureau of Immigration and Customs Enforcement, *not* FAMS. OPR is a subagency of ICE and is independent of FAMS. Ex. 2, Declaration of Traci A. Lembke, Att. 1, Directive 04-008, Delegation by the Assistant Secretary for Immigration and Customs Enforcement of Authority to Investigate Allegations of Employee Misconduct, June 18, 2004; Att. 2, Bureau of Immigration and Customs Enforcement, Directive 08001.1, Functions of the Office of Professional Responsibility, February 3, 2005. Plaintiffs offer nothing more than conclusory and imprecise characterizations to suggest that OPR's interview of Mr. Babb represented anything other than the exercise of OPR's legitimate and independent investigative authority. *See*, *e.g.*, Compl. ¶ 41 (referring loosely to "members of the *defendants*' Office of Professional Responsibility") (emphasis added). There is no allegation, for example, that FAMS controlled the OPR investigation, nor do plaintiffs even allege that OPR's questions could not have been related to a legitimate attempt to investigate allegations of wrongdoing. While adequate allegations of past injury would be insufficient to establish an imminent threat of injury, the absence of such allegations further demonstrates the absence of such a threat.

B.    Plaintiffs Fail to State a Claim Upon Which Relief Can Be Granted

Plaintiffs' claim also is subject to dismissal pursuant to Rule 12(b)(6). FAMA and its members have no constitutional right of association to resist all inquiries concerning the organization. According to plaintiffs, OPR asked about the names of FAMA's officers, its organizational structure, and the organization's public statements. Compl. ¶ 43. Requiring

responses to these questions in no way interfered with plaintiffs' right of association.  To the contrary, even when addressing the perilous position of the NAACP in 1950s Alabama, the Supreme Court recognized the state's legitimate interest in obtaining from the NAACP "such information as the State desires concerning the purposes of the Association and its activities within the State" and noted that the NAACP did not object "to divulging the identity of its members who are employed by or hold official positions within it."  *NAACP v. State of Alabama*, 357 U.S. 449, 464 (1958)).  *See Taverns for Tots, Inc. v. City of Toledo*, 341 F. Supp. 2d 844, 853 (N.D. Ohio 2004) ("Requiring disclosure of an association's officers is not impermissible") (*citing NAACP v. State of Alabama*, 357 U.S. at 464).   The Supreme Court held only that the State could not demand membership lists, something that OPR did not require.  *Id*.; Compl. ¶ 43.

       In addition, plaintiffs do not even make the basic allegation that OPR had no legitimate investigative reason for seeking the information.  *See Taverns for Tots, Inc.*, 341 F. Supp. 2d at 853 ("the City of Toldeo, unlike the state of Alabama in *NAACP*, has a legitimate interest in seeking this information").  Such an allegation would, in any event, be unavailing.  As explained *supra* at 12-13 and note 4, agencies are entitled to broad deference in determining the relevance of particular lines of inquiry, and the information requested is plainly relevant to a variety of legitimate areas of inquiry, including questions about the disclosure of sensitive information, unauthorized use of governmental resources, and unauthorized outside employment.  Plaintiffs have thus failed to make even the basic allegations necessary to establish a past right of association violation, let alone the immediate threat of a future such violation that is required to justify prospective equitable relief.

16

Further, even an improper investigation could not possibly justify the relief that plaintiffs seek in this case – *i.e.*, prospective equitable relief enjoining defendants from "compelling disclosure of FAMA information" in the future. Indeed, it is difficult to imagine *any* showing that would justify such an injunction. *See supra* at 12-14.

## III. PLAINTIFFS' CLAIM RELATING TO OPR INVESTIGATIVE PRACTICES SHOULD BE DISMISSED

Plaintiffs' third and final claim challenges OPR's alleged practice of "threaten[ing] members of FAMA with administrative and/or criminal action for discussing the nature of an OPR investigation with *anyone*." Compl. ¶ 54 (emphasis in original). As discussed *infra*, plaintiffs' description of the alleged policy is demonstrably false, and the claim should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

### A.     Plaintiffs' Description of the Alleged Policy is Inaccurate

Plaintiffs incorrectly state that the policy – communicated to Mr. Babb on November 17, 2004 – prohibits Mr. Babb from "discussing the nature of an OPR investigation with *anyone*." Compl. ¶ 54. In fact, the admonitions given to Mr. Babb specifically permitted him to discuss the nature of the interview with "private legal counsel." *See* Ex. 2, Att. 3, Disclosure Warning for Non-Bargaining Unit Employees ("Disclosure Warning"), November 17, 2004.[7] Indeed, as the instant case demonstrates, the policy has not inhibited the plaintiffs from discussing the

---

[7] As stated *supra*, the Court may consider documents outside of the pleadings in resolving a 12(b)(1) motion. The Court may also consider this document in evaluating defendants Rule 12(b)(6) motion without treating it as a motion for summary judgment because plaintiffs incorporate the warning by reference in their complaint. *See* Compl. ¶ 53 (referring to November 17, 2004, "threat" of disciplinary action for discussing the nature of the OPR investigation); *Bannum, Inc. v. Sawyer*, 251 F. Supp. 2d 7, 10 (D.D.C. 2003) (in evaluating a Rule 12(b)(6) motion, courts may consider documents "incorporated by reference in the complaint").

nature of the OPR investigation with counsel or from filing a lawsuit that publicized the nature of

the investigation and the questions asked.  Thus, the warnings that are specifically referenced in

plaintiffs' complaint themselves demonstrate that plaintiffs' claim is based upon a false

description of the alleged policy.

      B.     The Court Lacks Jurisdiction Over This Claim

Plaintiffs lack standing to challenge the alleged practice of instructing an OPR

interviewee not to discuss the nature of the interview with others.  As indicated *supra*, to

establish standing, plaintiffs must show that they face a "real and immediate" threat of harm from

the policy – *i.e.*, a real and immediate threat that (1) they will be interviewed as part of an OPR

investigation, and (2) that they will be prevented from discussing the investigation with

individuals with whom, absent OPR restrictions, they would otherwise have discussed the

investigation.  Plaintiffs have failed to allege, much less establish, that plaintiff Babb or FAMA's

members confront an immediate threat of such an investigation, and nothing would prevent the

party from bringing a legal challenge to the policy if the threat were to materialize.

Moreover, because authority over FAMS has been transferred to TSA, ICE OPR no

longer has investigative jurisdiction over FAMS employees.  There is, moreover, no allegation

that the TSA Internal Affairs office has the same policies governing investigative disclosures.

Thus, even if plaintiffs had properly alleged an imminent threat of investigation, they have failed

to establish that the office that would investigate them employs the policy that they are

challenging in this lawsuit.  Plaintiffs accordingly have failed to establish their standing to seek

prospective equitable relief against enforcement of the policy.

18

Plaintiffs' complaint also fails to establish a real controversy as to the application of the alleged policy to the investigation referred to in the complaint. As explained *supra*, nothing has prevented Mr. Babb from consulting legal counsel to safeguard his rights in connection with the investigation at issue.[8] Moreover, while continually emphasizing that the non-disclosure policy prevents Mr. Babb from speaking with "anyone" about the investigation, plaintiffs have failed to identify anyone who is truly unconnected with the investigation with whom he would like to discuss it. Instead, plaintiffs make only the bare allegation that Mr. Babb "would have" discussed the investigation with unspecified "other individuals not associated with the defendants' investigation . . . ." Compl. ¶ 55. Further, even were plaintiff Babb able to identify such an individual, it is not at all clear that such a conversation would qualify as a matter of public concern.[9] It is plaintiffs' burden to establish jurisdiction, and "such allegations will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a Rule 12(b)(6) motion for failure to state a claim." *Brady Campaign to Prevent Gun Violence United With the Million Mom March*, 339 F. Supp. 2d at 72 (internal citation, brackets, and quotation marks omitted).

---

[8]  It is also not clear that plaintiff Babb has standing to challenge restrictions on speaking with others who are concededly connected with the investigation. While he alleges that he "would have discussed the information solicited about FAMA and other topics discussed (sic) with other members of the FAMA's Board of Directors," Compl. ¶ 55, it is not clear whether he could legitimately feel similarly inhibited now that he is no longer under the jurisdiction of the office with the challenged policy and now that he has filed a lawsuit that contains specific allegations regarding the nature of the investigation.

[9]  "Embedded in the *Pickering* test is the condition that to qualify for its protection, government employee speech must involve 'matters of public concern.'" *Sanjour v. E.P.A.*, 56 F.3d 85, 90 (D.C. Cir. 1995) (*quoting Connick v. Myers*, 461 U.S. 138, 146 (1983)). *"*Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement as revealed by the whole record." *Id.* at 147-48. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147.

19

Mr. Babb's failure to identify such a person in his complaint, moreover, only highlights the fact that he has not been denied permission to speak to such an individual. As discussed in the next section, the non-disclosure warning serves important governmental interests related to protecting the integrity of government investigations as well as the privacy and working environment of employees. If a disclosure truly does not threaten any of those interests, however, then the agency should have the opportunity to adapt the non-disclosure warning to the particular circumstances of a particular case. There is no allegation that plaintiff Babb contacted OPR about an accommodation, and no reason to believe that OPR would have denied Mr. Babb the right to discuss his own investigation with others that were truly unconnected with the investigation.[10]

B.    Plaintiffs Fail to State a Claim Upon Which Relief Can be Granted

Plaintiffs assert that it violates the First Amendment to prohibit government employees interviewed in connection with an ongoing investigation from discussing the interview with others. Compl. ¶¶ 51-57. Because such a policy serves important government interests, plaintiffs are incorrect as a matter of law, and their claim must accordingly be dismissed.

The Supreme Court has long recognized that the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treasury Employees Union,* 513 U.S. 454, 465

---

[10]  To the contrary, the only "disciplinary and/or criminal sanctions" mentioned in the disclosure warning are "for interfering with or impeding an official investigation." *See* Ex. 1, Att. E, Disclosure Warning. By connecting the threat of disciplinary sanctions to the interests that form the basis for the disclosure warning, the warning itself suggests that a disclosure that truly did not threaten those interests could be permissible. Plaintiffs repeatedly assert that the warning threatened plaintiff Babb with "administrative and criminal sanctions" but, with each reference, omit the "for interfering with" language from their paraphrase of the warning. Compl ¶¶ 52-56.

(1995); *Waters v. Churchill*, 511 U.S. 661, 671, 675 (1994) ("the government as employer indeed

has far broader powers than does the government as sovereign. . . . The government's interest in

achieving its goals as effectively and efficiently as possible is elevated from a relatively

subordinate interest when it acts as sovereign to a significant one when it acts as employer").

"When a court is required to determine the validity of such a restraint, it must 'arrive at a balance

between the interests of the [employee], as a citizen, in commenting upon matters of public

concern and the interest of the State, as an employer, in promoting the efficiency of the public

services it performs through its employees.'" *NTEU*, 513 U.S. at 465-66 (*quoting Pickering v.*

*Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968) (brackets

in original)).  In striking the proper balance, courts must determine whether the restriction at

issue will alleviate real (as opposed to conjectural) harms "in a direct and material way."  *NTEU*,

513 U.S. at 475 (*quoting Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994))*.*

        Plaintiffs assert that the restriction at issue "is a content-based restriction on speech" and

that there "is no compelling governmental interest in restricting plaintiffs' ability to speak about

the nature of any interview conducted by OPR now or in the future."  Compl. ¶¶ 56-57.

However, strict scrutiny does not apply in the public employment context.  Instead, the *Pickering*

and *NTEU* cases provide the applicable standard.  *See Sanjour v. E.P.A.*, 56 F.3d 85, 90-91 (D.C.

Cir. 1995) (applying *Pickering*/*NTEU* to prohibition on receipt of reimbursement of travel

expenses from private sources for unofficial speech on employee's work where such

reimbursement was permitted for officially authorized speech on the same issues).[11]  Further, the

---

        [11]  Courts have repeatedly applied the standard for restrictions on speech in the public
employment context to governmental actions or policies that were triggered by the content of the speech
at issue, including restrictions on discussions of internal governmental investigations.  *See, e.g., Los*

restriction at issue in this case applies to all employees regardless of their position and regardless of the subject of the investigation or the nature of the interview.[12]  Moreover, unlike the honoraria restrictions at issue in *NTEU*, it applies only to the disclosure of a narrow category of information provided by the government itself  (*i.e.*, the existence of an investigation and the questions asked in the interview) that would not even be in the employee's possession in the first place were it not for the employee's duty to cooperate with internal investigations of wrongdoing. *Contrast United States v. NTEU*, 513 U.S. at 470 (1995) (noting that "the vast majority of the speech at issue in [the] case [did] not involve the subject of Government employment and [took] place outside the workplace . . . ."); *Sanjour*, 56 F.3d at 91 (addressing "regulations proscribing a broad category of speech by a large number of potential speakers").

---

*Angeles Police Protective League v. Gates*, 579 F. Supp. 36, 39-40 (C.D. Cal. 1984) (applying *Pickering* to restriction on discussing ongoing investigation); *see also United States v. Nat'l Treasury Employees Union*, 115 S. Ct. 1003 (1995) (ban on receipt of honoraria by public employees); *Waters v. Churchill*, 511 U.S. 661, 672-73 (1994) (listing various *ex post* and *ex ante* restrictions speech that would be permissible as applied to public employees that could not be applied to the public at large, including limitations on political activity, a regulation providing for discharge for speech that hindered "the efficiency of the service" and prohibitions on "being 'rude to customers'"); *Rankin v. McPherson*, 483 U.S. 378 (1987) (disciplinary action for comment concerning the President); *Connick v. Myers*, 461 U.S. 138 (1983) (discharge of assistant district attorney for distributing questionnaire on office policies); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) (discharge of teacher for criticizing allocation of school funds).

[12]  In this respect, the policy is unlike the subject of *Fraternal Order of Police v. Rubin*, 26 F. Supp. 2d 133, 144 (D.D.C. 1998), which involved instructions to particular officers in a particular investigation not to disclose the substance of their witness statements with any other officer.  With little explanation, the Court in that case found such instructions to be "content-based" subject "to the most exacting First Amendment scrutiny."  In this case, by contrast, the policy applies to all internal OPR investigations regardless of their subject or the identity of the parties involved.  The Court also did not address the significance of the characterization in public employment cases or discuss the standards for evaluating speech restrictions in the public employment context.  The Court thus did not hold that they were somehow inapplicable.  Any such suggestion would, in any event, be precluded by the cases discussed in the prior footnote and by the decision of this Circuit in *Sanjour*.

Applying the correct standard, it is clear that plaintiffs have failed to state a claim as a matter of law. *See Hall v. Ford*, 856 F.2d 255, 256, 264-65 (D.C. Cir. 1988); *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 780, 783 n.1, (9th Cir. 1997) (both dismissing employee speech claims pursuant to Rule 12(b)(6) because the government's interest outweighed the countervailing interests as a matter of law). The challenged policy materially advances several important government interests. Government agencies such as ICE must have effective internal offices for independently and thoroughly investigating allegations of employee misconduct and ensuring compliance with internal policies and procedures. Within ICE, the Office of Professional Responsibility performs that critical function. The policy at issue protects the integrity of those investigations, and the ability of ICE OPR to carry out its independent investigative function, by preventing interviewed employees and management from influencing in any way (whether intentionally or unintentionally) the statements of witnesses and other individuals connected to the investigation. *See Orange v. District of Columbia*, 59 F.3d 1267 (D.C. Cir. 1995) ("the government's interest in protecting the integrity of its investigations into fraud clearly outweighed whatever interest Orange had in disclosing confidential information obtained as a result of his own investigation"); *Black v. City of Auburn, Alabama*, 857 F. Supp. 1540, 1549 (M.D. Al. 1994) (describing as "frivolous" an argument that an instruction "not to discuss the charges against him with any of the other parties to the investigation while the investigation was ongoing" violated the First Amendment); *Los Angeles Police Protective League v. Gates*, 579 F. Supp. 36, 39-40 (C.D. Cal. 1984) (upholding an order prohibiting a police officer "from discussing the investigation with other suspects or witnesses" until the completion of the investigation).

23

The policy also protects the interests of employees in two important ways. *First*, it protects employees from the curious eyes of supervisors by giving them a clear basis for declining to answer supervisors' questions about an ongoing investigation. *Second*, preventing disclosure of the nature of a particular investigative interview protects the privacy of other employees who are involved in the investigation, a particularly compelling interest where the allegations that led to the investigation later prove to be unfounded and no action is ever taken.[13]

While such weighty interests alone justify the policy in the public employment context, it is also worth noting the minimal First Amendment interest at issue. Even assuming *arguendo* that an actual disciplinary action against Mr. Babb for violation of internal rules would be a matter of public concern, a confidential internal investigation of potential violations is just that – an investigation. *Cf. Bannum, Inc. v. Sawyer*, 251 F. Supp. 2d 7, 11 (D.D.C. 2003) (holding that the decision to investigate is not final agency action for purposes of the Administrative Procedures Act). OPR could well determine that the allegations that led to the investigation are unfounded, in which case, there would be no disciplinary action. Where an investigation results in agency action, the challenged policy does not prevent the employee from commenting on that action. And even assuming that there could be rare instances where an investigation by the independent Office of Professional Responsibility alone could threaten an employee's legal

---

[13]  Plaintiffs also inadvertently provide another justification for the confidentiality policy with their allegation that the purpose of the FAMA investigation "was to chill the protected speech and associational rights of the plaintiffs and its members." Compl. ¶ 26. If disclosure of the existence of this or any other investigation could have a chilling effect, it stands to reason that limitations on disclosure will reduce that potential and avoid unnecessary concern on the part of agency personnel during the pendency of an investigation. *Cf. F.T.C. v. Invention Submission Corp.*, 1991 WL 47104, *4 (D.D.C. 1991) ("Since not all investigations result in the issuance of a complaint, informing customers at this preliminary stage may cause unnecessary alarm").

rights, the current policy enables an employee to protect his or her rights by discussing the

interview with private counsel and, if necessary, by commencing legal action.[14]

### CONCLUSION

For the foregoing reasons, plaintiffs' claims should be dismiss pursuant to Fed. R. Civ. P.

12(b)(1) and 12(b)(6).

<div style="margin-left:40%">

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General


KENNETH L. WAINSTEIN
United States Attorney


SUSAN K. RUDY
Assistant Branch Director


/s/_____
SAMUEL C. KAPLAN (D.C. Bar No. 463350)
GILLIAN FLORY (Maryland Bar)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, Rm. 7302
Washington, D.C.  20044
(202) 514-4686 phone
(202) 616-8202 fax
samuel.kaplan@usdoj.gov
Attorneys for Defendants

</div>

Dated:     October 6, 2005

---

[14]  The speech interest in this case is particularly insubstantial inasmuch as Mr. Babb has failed even to make the bare allegation that the speech at issue relates to a matter of public concern.  Nor is the public's interest in the speech at issue clear from plaintiffs' allegations.  Mr. Babb wishes to disclose to other participants in the investigation and unnamed other individuals that OPR has inquired as to the identity of FAMA's officers and other issues related to FAMA's structure.  It is unclear why such hypothetical comments should be viewed as commenting on issues of public concern.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| TERRY M. BABB and FEDERAL AIR ) | |
| MARSHAL ASSOCIATION, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 05-cv-1088 (RCL) |
| ) | |
| Department of Homeland ) | |
| MICHAEL CHERTOFF, Secretary, ) | |
| Security, and THOMAS D. QUINN, ) | |
| Director, Federal Air Marshal ) | |
| Service, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## ORDER

Upon consideration of Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P.

12(b)(1) and 12(b)(6), it is hereby

ORDERED that Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and

12(b)(6) is GRANTED.

SO ORDERED.


Dated: _____          _____

                                        ROYCE C. LAMBERTH
                                        United States District Judge